UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| ANTHONY CAPERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No: |
| v. | ) | |
| | ) | |
| CSX TRANSPORTATION, INC. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Serve Registered Agent: | ) | |
| CT Corporation System | ) | |
| 289 S. Culver Street | ) | |
| Lawrenceville, GA 30046-4805 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff, and for his causes of action against Defendant CSX Transportation, Inc. (hereinafter "CXST"), states as follows:

### STATEMENT OF CASE

1.    Plaintiff was a railroad freight engineer and conductor for the Defendant for approximately 12 years from 2005 until he was terminated on March 2, 2017.

2.    Plaintiff's termination was due to one or more of the following actions of Defendant:

(a)    That Defendant harassed and terminated Plaintiff in retaliation for refusing to violate the Hours of Service Law, 49 U.S.C. § 211, et seq.;

(b)    That Defendant harassed and terminated Plaintiff in retaliation for calling the Federal Rail Administration; Department of Transportation (hereinafter "FRA") and reporting the attempt to get him to violate the Hours of Service Law;

1

(c)     That Defendant harassed and terminated Plaintiff for his cooperation in the subsequent FRA investigation that, upon information and belief, included a site inspection on Defendant's dispatch center;

(d)     That Defendant harassed and terminated Plaintiff for making complaints about railroad safety and/or for violating railroad rules and federal regulations;

(e)     That Defendant harassed and terminated Plaintiff due to his disability;

(f)     That Defendant harassed and terminated Plaintiff in retaliation for his requesting a reasonable accommodation;

(g)     That Defendant harassed and terminated Plaintiff in retaliation for making complaints for, among others, his wrongful removal from service because of his previously approved medications and his need to take off from work due to his medical condition;

(h)     That Defendant interfered with Plaintiff's Family Medical Leave and/or retaliated against him for taking Family Medical Leave;

(i)     That Defendant harassed and terminated Plaintiff due to his race in violation of Title VII of the Civil Rights Act of 1964, as amended; and/or

(j)     That Defendant harassed and terminated Plaintiff due to his race in violation of 42 U.S.C. § 1981.

3.      This is an action brought to remedy, inter alia, Defendant's violations of Plaintiff's civil rights pursuant to Title VII of the Civil Rights Act of 1964, as amended; the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.; Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.; the Federal Rail Safety Act, 49 U.S.C. § 20109; and 42 U.S.C. § 1981.

## JURISDICTION AND VENUE

4.      This Honorable Court has jurisdiction pursuant to 42 U.S.C. 2000e-5, 49 U.S.C. 20109(d)(3), 29 U.S.C. § 2617(a)(2) and 28 U.S.C. §§ 1331.

5.      Plaintiff received a notice of right to sue from the Equal Employment Opportunity Commission (See Exhibit 1).

6.      Plaintiff filed a complaint with OSHA on June 6, 2017 and more than 210 days has elapsed without a final decision by the Secretary of Labor.

7.      Defendant regularly and systematically conducts and transacts business associated with and in the counties comprising the Southern District of Georgia.

8.      Venue is proper within this Court because the unlawful practices complained of herein occurred in the counties comprising the Southern District of Georgia, Augusta Division.

## THE PARTIES

9.      Plaintiff Anthony Capers is an individual who resided at all relevant times in the City of Aiken, State of South Carolina.

10.     Defendant CSXT is a Virginia corporation with its principal place of business in the State of Florida.

## ALLEGATIONS COMMON TO ALL COUNTS

11.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1-10 as if fully stated herein.

12.     Defendant is a Class I freight railroad that primarily operates and provides railroad transportation in the eastern half of the United States.

13.     Plaintiff was employed by defendant for approximately 12 years.

14.     Plaintiff was a freight engineer and conductor for Defendant and his work substantially affected interstate commerce.

15.     Capers was hired by CSXT as a conductor in approximately 2005.

16.     Capers was promoted to engineer by CSXT in approximately October 2014.

17.     During his 12-year employment, Plaintiff had a good work history.

**A.     HOURS OF SERVICE REFUSAL**

18.     Federal law regulates the number of hours that a railroad employee can be performing certain services.

19.     These laws are humanitarian laws meant to promote the safe operation of railroads by helping to ensure railroad employees are rested.

20.     Failure to abide by Hours of Service laws can lead to railroad accidents that could not only injure employees but also the public.

21.     In approximately June 2015, Capers warned the crew dispatcher that he was close to running out of his hours of service and that he would need a relief crew.

22.     The dispatcher attempted to get Capers to continue operating the train in violation of the Hours of Service Law, 49 U.S.C. § 211, et seq.

23.     Capers refused to violate the hours of service law.

24.     Capers called the Terminal Manager and Trainmaster; however, they did not want to get involved with it.

25.     As a result of this incident, Capers communicated with and complained to the Federal Railroad Administration (FRA) about what had transpired.

26.     After this communication, the FRA investigated Respondent for these actions.

27.     Capers was contacted and interviewed by the FRA.

28.     Upon information and belief, the FRA visited Respondent's Florence Division dispatch center as a result of this investigation.

29.     Soon thereafter, Capers' supervisor(s) began harassing and retaliating against him.

**B.      MEDICAL CONDITION AND FMLA**

30.     Capers has a serious medical condition that substantially limits one or more major life activity.

31.     Capers periodically gets major migraine headaches that cause debilitating pain requiring him to miss work on an intermittent basis.

32.     In order to accommodate this condition, Capers requested, and Defendant granted, a reasonable accommodation of intermittent medical leave in approximately 2007.

33.     At one point, Capers was held out of service for approved medications that treated his condition.

34.     Capers complained about being held out of service and was reinstated.

35.     In approximately 2015, Capers applied for a promotion to management and did not receive this promotion.

36.     Capers had a conversation with his supervisor, Trainmaster Charlie Licht, about why he was not chosen and what he could do to improve his chances for promotion.

37.     The Trainmaster's response was that Capers needed to work on his attendance.

38.     Upon information and belief, Capers' attendance issues were related to the taking of his approved medical leave.

39.     In July or August of 2016, Capers was required to disclose his medications to another supervisor.

5

40.     Capers was pulled from service again for medical clearance despite these medications being previously approved.

41.     Capers complained to the Terminal Manager about his removal from service.

42.     Capers completed the medical clearance process and was finally able to return to work.

**C.     TRANSFER TO MANCHESTER**

43.     In February 2016, Capers decided to transfer to a new location out of the Manchester terminal.

44.     Instead of getting a new start, a supervisor from Augusta called management in the new location to disparage Capers.

45.     In order to operate a train on a new subdivision, an employee is required to train and then perform a qualifying run.

46.     During this process, Capers was stymied by not getting proper training.

47.     He further was given qualifying runs in violation of FRA and/or railroad rules.

48.     Capers performed three qualifying runs and CSXT management failed him on these runs.

**D.     RETURN TO AUGUSTA AND RECERTIFICATION RUNS**

49.     In August 2016, Capers was then returned to Augusta by CSXT.

50.     An engineer is required by the FRA to have a certification card.

51.     To be certified, an engineer must either be tested on a certification run or via a railroad simulator.

52.     49 CFR Appendix E to Part 240 outlines: "It is essential that railroads conduct the performance skills testing in the most objective manner possible…"

53.     CSXT failed to follow this regulation by testing in the most objective manner possible.

54.     Capers and other co-workers complained to management throughout this process that CSXT was singling out Capers and not performing the test in an objective manner.

55.     Capers was offered retraining by CSXT and ordered to take a recertification run.

56.     The training offered Capers was in violation of FRA and railroad rules.

57.     Capers complained to management that the training offered was in violation of rules and/or regulations.

58.     On September 26, 2016 at 7:02 a.m., Capers is assigned for his certification run a Rock Train to Savannah by his supervisor RFE Clark.

59.     This is considered an over the road train.

60.     Within a couple of hours, Capers is informed that there is a change of plans and that he is now going to be assigned the F753.

61.     The F753 is what is known as a local road switcher.

62.     This particular local switcher is a notoriously difficult train that is usually operated by senior engineers.

63.     The F753 is a much harder train to certify on than the rock train that Capers was initially scheduled to take.

64.     This is in part because of the amount of railroad movements and changes in the throttle necessary for a switching operation.

65.     Capers questioned RFE Clark about the change in trains.

66.     The response was that RFE Clark was just following orders from Senior RFE Cokely.

67.     Capers contacted Senior RFE Cokely to ask why he was being required to certify on a road switcher and that he had never heard of someone being forced to recertify on a road switcher.

68.     Senior RFE Cokely told Capers that he was putting him on the hardest train on the subdivision.

69.     After learning about Capers recertifying on the run, a co-employee openly complained to management that CSX was setting him up to fail.

70.     RFE Clark was also questioned by a co-employee as to why CSXT was having Capers recertify and why they were forcing him to do so on this train.

71.     RFE Clark responded that it was coming from higher up.

72.     During this time period, Capers was having flare-ups of his medical health condition.

73.     He was originally scheduled for a certification run in October.

74.     However, due to Capers medical condition, he laid off work pursuant to his medical leave.

75.     On October 21, 2016, his supervisor texted him stating that "Due to your sudden medical issue again, the qualifying ride for Monday has been reschedule for Wednesday on the F753. Failure to report will result in insubordination."

76.     Capers performed this first Augusta run with RFE Clark.

77.     RFE Clark orally stated that Capers had passed.

78.     RFE Clark took notes during the trip.

79.     Upon information and belief, RFE Clark left these notes on the train.

80.     This handwritten note states, among others, "Anthony is good."

81.    Capers was subsequently failed by RFE Clark.

82.    Upon information and belief, the order to fail Capers came from upper management.

83.    Capers was rescheduled for a second and final certification run.

84.    Capers was brought in to an office for a meeting by management.

85.    During this meeting, Capers was again told that failure to attend the test would be insubordination.

86.    Despite having a serious medical condition, Capers attended his second and final Augusta certification run.

87.    Capers was assigned a different supervisor, RFE Smith.

88.    When questioned about why RFE Clark was not here, RFE Smith explained Senior RFE Cokely wanted him there so it "did not look bad."

89.    Prior to the trip commencing, his supervisor, RFE Smith, mentioned that Capers did not look well.

90.    During the trip, RFE Smith again noticed the severity of his medical condition and ordered the other engineer on board to take over the controls for a while.

91.    The locomotive unit given Plaintiff was an older engine with desktop controls and there were mechanical issues with the unit.

92.    As a result, RFE Smith requested they swap engines.

93.    This request was refused by the Terminal Manager and Trainmaster.

94.    During the trip, RFE Smith made multiple comments that he felt the process that Plaintiff was undergoing was wrong and that he was just doing what he was told.

95.    After the trip, RFE Smith verbally told Anthony he passed.

96.     Capers is subsequently graded by the required EER form.

97.     Capers was failed by 1 deduction.

98.     Capers challenged the deductions and proved that the 1 deduction was improper which should have meant that he passed.

99.     Instead, CSXT against prior practice and FRA regulations, reviews the entire "black box" download called the ERAD in an attempt to fail Capers.

100.    CSXT's own rules outline that the certification is to be scored by a written report called an EER.

101.    The CSXT rule states: "During the test the train service engineer will be scored using the EER."

102.    Upon information and belief, CSXT has never used an ERAD to score a certification run.

103.    Alleged solely in the alternative to paragraph 102, CSXT rarely uses an ERAD to score a certification run.

104.    49 CFR 240.307(i) requires CSXT to account for circumstances that an intervening cause prevented or materially impaired Petitioner's ability to comply with railroad rules

105.    CSXT failed to account for intervening circumstances.

106.    Previously, on May 4, 2016, Capers passed a railroad simulator test.

107.    Upon information and belief, Capers scored a 98%.

108.    Capers was required by CSXT to recertify on that territory despite already having his certification.

109.    Capers when subjected to objective tests on a computer simulator passes with flying colors.

110.    However, when Capers is subjectively tested by management, CSXT fails him.

111.    The recertification runs were completed in violation of FRA regulations.

112.    Capers complained to management during these tests that these tests were being done in violation of FRA regulation because, among others, they were not being done in an objective fashion.

113.    CSXT decertified Plaintiff's engineer certification on February 24, 2017.

114.    Plaintiff was still a certified conductor.

115.    Plaintiff could not even hold the job of an engineer in Augusta due to his seniority.

116.    Despite this, CSXT terminated Plaintiff from all employment on February 24, 2017.

117.    Defendant did not have justification for terminating plaintiff's employment.

118.    Defendant's stated reasons were pretextual.

119.    Following the actions of Defendant, Plaintiff timely filed a complaint with the Equal Opportunity Employment Commission and was subsequently issued a Notice of Right to Sue, a copy of which is attached as Exhibit 1.

120.    Following the actions of Defendant, Plaintiff timely filed a complaint with the Occupational Safety and Health Administration.

121.    Defendant's termination of Plaintiff was due to one or more of the following illegal reasons:

## COUNT I

### (Americans with Disabilities Act – Disability Discrimination)

122.    Plaintiff restates and realleges paragraphs 1-121 of this Complaint.

123.    Defendant is an entity engaged in an industry affecting commerce.

124.   Defendant is an entity who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

125.   At all relevant times, Plaintiff was an individual employed by Defendant.

126.   Plaintiff has a chronic medical condition that substantially limits one or more major life activity.

127.   Alternatively, Defendant regards Plaintiff as having such a condition.

128.   Plaintiff was qualified to do the essential functions of his job.

129.   Defendant was aware of Plaintiff's condition and limitations.

130.   Plaintiff requested medical leave to help take care of his condition.

131.   Defendant granted medical leave.

132.   Defendant repeatedly harassed and intimidated Plaintiff regarding his disability and reasonable accommodation.

133.   Management verbalized their dissatisfaction with Plaintiff about missing work due to his disability.

134.   Plaintiff's disability was a motivating factor in Defendant's wrongful discriminatory treatment described and set forth above including, but not limited to Plaintiff's termination.

135.   Defendant's actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

136.   Defendant and its agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of his disability.

137.   As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to: past and future wage loss; past and future lost earning capacity; loss of career opportunities; shame, humiliation,

embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

138.    Defendant's actions were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendant for its wrongful conduct and deter it and others from like conduct in the future.

WHEREFORE, Plaintiff prays that judgment be entered against Defendant and that Plaintiff be awarded past, present and future lost wages and benefits; compensatory damages, punitive and exemplary damages; interest, costs and reasonable attorneys' fees and expert witness fees; any other relief afforded Plaintiff under The Americans with Disabilities Act and The Civil Rights Act, and all other relief deemed just and equitable.

## COUNT II

### (Americans with Disabilities Act – Retaliation)

139.    Plaintiff restates and realleges paragraphs 1-133 of this Complaint.

140.    On more than one occasion, Defendant pulled Plaintiff out of service for medical reasons.

141.    Plaintiff complained to management about the fact that he was wrongfully pulled from service.

142.    Plaintiff requested medical leave as a reasonable accommodation for his condition.

143.    Defendant granted this reasonable accommodation.

144.    Despite granting this reasonable accommodation, Defendant, by and through its management employees, retaliated against Plaintiff including, but not limited to, harassment and termination of Plaintiff's employment.

145.   Plaintiff's reasonable accommodation and/or Plaintiff's complaints were a motivating factor in Defendant's wrongful discriminatory treatment described and set forth above including, but not limited to Plaintiff's termination.

146.   Defendant's actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

147.   Defendant and its agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of his disability.

148.   As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to: past and future wage loss; past and future lost earning capacity; loss of career opportunities; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

149.   The actions of Defendant were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendant for its wrongful conduct and deter it and others from like conduct in the future.

WHEREFORE, Plaintiff prays that judgment be entered against Defendant and that Plaintiff be awarded past, present and future lost wages and benefits; compensatory damages, punitive and exemplary damages; interest, costs and reasonable attorneys' fees and expert witness fees; any other relief afforded Plaintiff under The Americans with Disabilities Act and The Civil Rights Act, and all other relief deemed just and equitable.

## COUNT III

### (Family Medical Leave Act - Interference)

150.     Plaintiff restates and realleges paragraphs 1-121 of this Complaint.

151.     The FMLA prohibits Defendant from interfering with, restraining, denying the exercise of or the attempt to exercise of any right provided under the FMLA.

152.     Defendant is an employer with 50 or more employees within 75 miles of Plaintiff's job location.

153.     Plaintiff was otherwise eligible for FMLA leave.

154.     Defendant granted Plaintiff intermittent medical leave under the FMLA.

155.     Among others, 29 C.F.R. § 825.220 (c) prohibits interference by "an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights…By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies."

156.     Defendant interfered with Plaintiff's FMLA rights in violation of, among others, 29 C.F.R. § 825.220 (c) when it "use(d) the taking of FMLA leave as a negative factor in" the employment actions of terminating Plaintiff.

157.     That as a result of the wrongful actions of Defendant, Plaintiff lost wages, salary, employment benefits, and/or other compensation.

WHEREFORE Plaintiff prays for Judgment against Defendant for lost wages, salary, employment benefits, and/or other compensation denied or lost; the interest on said damages calculated at the prevailing rate; liquidated damages prescribed by statute equal to the above damages; equitable relief as may be appropriate, including employment or reinstatement;

reasonable attorney's fees, reasonable expert witness fees, and other costs of the action; and such other and further relief as the court deems just and appropriate.

## COUNT IV – IN THE ALTERNATIVE TO COUNT III

### (Family Medical Leave Act – Discrimination/Retaliation)

158.    Plaintiff restates and realleges paragraphs 1-121 of this Complaint.

159.    The FMLA prohibits discrimination and/or retaliation for exercising rights under the FMLA.

160.    Defendant is an employer with 50 or more employees within 75 miles of Plaintiff's job location.

161.    Plaintiff was otherwise eligible for FMLA leave.

162.    Defendant granted Plaintiff intermittent medical leave under the FMLA.

163.    Defendant discriminated and/or retaliated against Plaintiff when it terminated Plaintiff for the taking of a leave granted to him pursuant to the Family and Medical Leave Act.

164.    Defendant's termination of Plaintiff was directly related to, or was caused by, Plaintiff's exercise of his rights under the FMLA.

165.    That as a result of the wrongful actions of Defendant, Plaintiff lost wages, salary, employment benefits, and/or other compensation.

WHEREFORE Plaintiff prays for Judgment against the Defendant for lost wages, salary, employment benefits, and/or other compensation denied or lost; the interest on said damages calculated at the prevailing rate; liquidated damages prescribed by statute equal to the above damages; equitable relief as may be appropriate, including reinstatement; reasonable attorney's fees, reasonable expert witness fees, and other costs of the action; and such other and further relief as the court deems just and appropriate.

## COUNT V

### (Federal Rail Safety Act)

166.   Plaintiff restates and realleges paragraphs 1-121 of this Complaint.

167.   Plaintiff refused to, among others, violate the Hours of Service law.

168.   Plaintiff complained to management about the improper conduct of the dispatcher.

169.   Plaintiff complained to the FRA about the improper conduct of the dispatcher.

170.   Plaintiff cooperated with the subsequent investigation by the FRA.

171.   Defendant was aware of Plaintiff's complaints of safety.

172.   During the recertification process, Plaintiff and Plaintiff's co-workers repeatedly complained to management about the impropriety of the testing process including that it was not being performed in an objective manner and that there were intervening circumstances including Plaintiff's medical condition.

173.   FRSA, among others, makes it unlawful for a railroad carrier to "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done…

(1) to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security,…, if the information or assistance is provided to or an investigation stemming from the provided information is conducted by--

(A) a Federal, State, or local regulatory or law enforcement agency (including an office of the Inspector General under the Inspector General Act of 1978 (5 U.S.C. App.; Public Law 95-452);

(C) a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct;"

(2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security;

(5) to cooperate with a safety or security investigation by the Secretary of Transportation...;

(7) to accurately report hours on duty pursuant to chapter 211.

174.    Plaintiff's complaints and other actions outlined above were a contributing factor in his termination.

175.    As a direct result of Defendant's unlawful discharge of Plaintiff, Plaintiff has suffered injuries and damages including but not limited to discipline, termination, wage loss, lost benefits, costs and attorney's fees.

176.    As a direct result of Defendant's unlawful discharge of Plaintiff, he has suffered shame, humiliation, embarrassment, anxiety, loss of sleep and interference with his enjoyment of life; and emotional distress, all of which may continue into the future.

177.    Defendant's actions were willful, intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Complainant, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendant for its wrongful conduct and deter it and others from like conduct in the future.

WHEREFORE, Plaintiff prays for Judgment against the Defendant for reinstatement with his seniority status intact, any discipline related to the discrimination be permanently removed from his record, all backpay plus interest, lost benefits, and compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees, and for damages to punish

Defendant and deter others like it from similar conduct in the future and a for such other and further relief as is deemed just.

## COUNT VI

### (Civil Rights Act - Race/Color Discrimination)

178.    Plaintiff restates and realleges paragraphs 1-121 of this Complaint.

179.    At all relevant times, Defendant was an employer and/or an agent covered by and within the meaning of the Civil Rights Act of 1964.

180.    Plaintiff is in a protected class in that he is an African-American.

181.    Upon information and belief, African-American employees are graded and disciplined more harshly than Caucasian employees.

182.    Plaintiff was terminated while another employee was allowed to break a major rule without impunity directly in front of several management employees.

183.    Upon information and belief, African-American employees out of the Augusta subdivision are terminated at a higher percentage than Caucasian employees.

184.    Plaintiff's race was a motivating factor in Defendant's wrongful discriminatory treatment described and set forth above including, but not limited to Plaintiff's termination.

185.    Defendant's actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

186.    Defendant and its agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of race.

187.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to the following: past and future wage loss; past and future lost earning capacity; loss of career opportunities; shame, humiliation,

embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

188.   All of the actions of Defendant were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendant for its wrongful conduct and deter it and others from like conduct in the future.

WHEREFORE, Plaintiff prays that judgment be entered against Defendant and that Plaintiff be awarded past, present and future lost wages and benefits; compensatory damages, punitive and exemplary damages; interest, costs and reasonable attorneys' fees and expert witness fees; any other relief afforded Plaintiff under The Civil Rights Act, and all other relief deemed just and equitable.

## COUNT VII

### (42 U.S.C. § 1981)

189.   Plaintiff restates and realleges paragraphs 1-121, 177-181 of this Complaint.

190.   Defendant violated United States law, specifically 42 U.S.C. § 1981, by wrongfully terminating Plaintiff's employment and subjecting him to harassment and/or discriminatory conduct.

191.   Plaintiff was treated differently by the Defendant than white employees.

192.   Plaintiff's race was a motivating factor in Defendant's wrongful discriminatory treatment described and set forth above including, but not limited to Plaintiff's termination.

193.   Defendant's actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

194.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to the following: past and future wage loss; past and future lost earning capacity; loss of career opportunities; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

195.    All of the actions of Defendant were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendant for its wrongful conduct and deter it and others from like conduct in the future.

WHEREFORE, Plaintiff prays that judgment be entered against Defendant and that Plaintiff be awarded past, present and future lost wages and benefits; compensatory damages, punitive and exemplary damages; interest, costs and reasonable attorneys' fees and expert witness fees; any other relief afforded Plaintiff under 42 U.S.C. § 1981, and all other relief deemed just and equitable.

Respectfully submitted,

BELL & BRIGHAM

/s/ Titus T. Nichols
Titus T. Nichols
457 Greene Street
Augusta, GA 30901
(706) 722-2014
(706) 722-7552 (fax)
titus@bellbrigham.com

and

THE FURNISS LAW FIRM, LLC

/s/ Ryan M. Furniss
Ryan M. Furniss (MO #53787)(pro hac vice forthcoming)
222 S. Central Avenue, Suite 1004
Saint Louis, MO 63105
(314) 899-9101
(314) 627-5891 (fax)
rfurniss@furnisslaw.com